**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAZZ PHARMACEUTICALS, INC., | |
| *Plaintiff,* | CIVIL ACTION NO. 18-602 |
| v. | |
| SYNCHRONY GROUP, LLC, SYNCHRONY HEALTHCARE COMMUNICATIONS, INC., SYNCHRONY MEDICAL COMMUNICATIONS, INC., INPHASE COMMUNICATIONS, INC., AND SYNCHRONY ALLIANCE CONSULTING, LLC, | |
| *Defendants.* | |

## MEMORANDUM OPINION

**Rufe, J.**                                                                                    **December 3, 2018**

Plaintiff Jazz Pharmaceuticals, Inc. filed suit against Defendants Synchrony Group, LLC and its related entities (collectively, "Synchrony") for violations of the federal Defend Trade Secrets Act ("DTSA"),[1] the Pennsylvania Uniform Trade Secrets Act ("PUTSA"),[2] breach of contract, breach of duty of loyalty, and breach of fiduciary duty. Synchrony now moves to dismiss the Complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. For the following reasons, the motion will be granted in part and denied in part.

---

[1] 18 U.S.C. § 1832 *et seq.*

[2] 12 Pa. Const. Stat. Ann. § 5301 *et seq.*

## I.    BACKGROUND[3]

Jazz is a California-based pharmaceutical company which manufactures various sleep medications, including Xyrem—an FDA-approved prescription drug used to treat narcolepsy. As part of efforts to expand the number of patients benefitting from Xyrem and its other sleep-related drugs, Jazz engaged in business discussions with Synchrony, a Pennsylvania-based pharmaceutical marketing firm, to develop and execute marketing support and evaluation services.

On March 1, 2012, Jazz and Synchrony entered into a Master Services Agreement ("MSA"), which was later amended to extend its term to March 1, 2018. The MSA, as amended, detailed the scope of the parties' relationship and included provisions to protect Jazz's confidential information. The protected information included various forms of data and technology, as well as business, financial, marketing, and manufacturing processes related to Jazz's products. The MSA also required Synchrony to refrain from using or disclosing Jazz's outlined confidential information at any time or for any purpose either during, or after, the term of the MSA, without Jazz's prior written consent. If a party prematurely terminated the MSA or if Jazz requested, Synchrony had to return or destroy all confidential information.

Over the course of the next several years, Synchrony accessed valuable information concerning all aspects of Jazz's medical marketing and development plans for Xyrem and other sleep-related drugs. Jazz provided Synchrony with marketing strategies and tactics for promoting its products, non-public drug sales data and data regarding physician-prescribing habits, market research commissioned by Jazz surveying patients' and doctors' habits and

---

[3] Except where otherwise stated, the following facts are drawn from the Complaint and are assumed to be true for purposes of the motion to dismiss.

preferences, Jazz's analyses of its own products compared to other narcolepsy products, and risk evaluation and mitigation strategy research and information. To restrict the accessibility of such information, Jazz imposed strict limitations on its dissemination through employee confidentiality agreements, non-disclosure agreements with third parties, employee handbook policies, and coded access cards to lock and monitor Jazz's physical facilities.

By November 21, 2017, approximately three months prior to the end of the MSA term, Synchrony's CEO informed Jazz of its potential interest in working with Harmony, a newly formed pharmaceutical company which had recently acquired a narcolepsy drug, pitolisant, not yet approved in the United States. Synchrony planned to move "the best of its personnel" to a different division to focus on other clients, such as Harmony. Approximately one week later, Synchrony notified Jazz that it had signed a services agreement to act as the agency of record for Harmony. The next day, Synchrony sent a letter to Jazz, declaring its desire to terminate all sleep-related projects with Jazz, despite the existence of twenty open projects relating to Xyrem and other sleep-related drugs.

Even though Jazz attempted throughout December of 2017 and January of 2018 to negotiate a business solution to continue its collaboration with Synchrony, Synchrony failed to respond to such requests. The CEO of Synchrony did, however, admit that he had given Harmony the names of several Jazz employees in commercial, medical affairs, and regulatory roles that Harmony should consider trying to hire to build its narcolepsy treatment business. Synchrony then returned some, but not all, of Jazz's confidential information.

Jazz filed suit, asserting claims against Synchrony for violations of the DTSA (Count I), PUTSA (Count II), breach of contract (Count III), breach of duty of loyalty (Count IV), and breach of fiduciary duty (Count V). Jazz also filed a motion for a temporary restraining order

and preliminary injunction, demanding that Synchrony immediately return all information

relating to its work for Jazz, refrain from using or disclosing Jazz's confidential information and

trade secrets, and desist from providing services to Harmony.

Synchrony agreed to comply with a voluntary stipulated preliminary injunction, which

the Court approved. Under the injunction, Synchrony agreed to return all listed confidential

information to Jazz, refrain from using or disclosing Jazz's confidential information and trade

secrets, and produce Synchrony's CEO for deposition concerning Synchrony's use of Jazz's

confidential information.

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) permits a party to move for dismissal of any

claim over which the district court lacks subject matter jurisdiction.[4] A motion to dismiss under

Rule 12(b)(1) therefore challenges the power of a federal court to hear a claim or case.[5] When

faced with a 12(b)(1) motion, the plaintiff must bear the burden of persuasion to convince the

court that it has jurisdiction.[6]

Proper grounds for a Rule 12(b)(1) motion to dismiss includes the issue of mootness,

since the mootness doctrine implicates jurisdictional matters.[7] A plaintiff's claim is rendered

moot "when 'the issues presented are no longer live or the parties lack a legally cognizable

---

[4] Fed. R. Civ. P. 12(b)(1).

[5] *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006).

[6] *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991) (citation omitted).

[7] *See Mollett v. Leicth*, 511 F. App'x 172, 173 (3d Cir. 2013) (noting that when a claim is moot, "a federal court lacks jurisdiction to hear it") (citation omitted); *Goodmann v. People's Bank*, 209 F. App'x 111, 113–15 (3d Cir. 2006) (finding that a "District Court lacks subject matter jurisdiction when the controversy has become moot" and affirming the dismissal of a mooted civil action pursuant to Fed. R. Civ. P. 12(b)(1)).

interest in the outcome.'"[8]  The central question of all mootness issues, then, "is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief."[9]

## B.  Federal Rule of Civil Procedure 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), dismissal of a complaint for failure to state a claim upon which relief can be granted is appropriate where a plaintiff's "plain statement" lacks enough substance to demonstrate that he is entitled to relief.[10]  In determining whether a motion to dismiss should be granted, the court must consider only those facts alleged in the complaint, accepting the allegations as true and drawing all logical inferences in favor of the non-moving party.[11]  Courts are not, however, bound to accept as true legal conclusions framed as factual allegations.[12]  Something more than a mere *possibility* of a claim must be alleged; a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."[13]  The complaint must set forth "direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory."[14]  Deciding a motion to dismiss, courts may consider "only allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."[15]

---

[8] *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of the Virgin Islands*, 842 F.3d 201, 208 (3d Cir. 2016) (quoting *Cty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979)).

[9] *Id.* (quoting *Rendell v. Rumsfeld*, 484 F.3d 236, 240 (3d Cir. 2007)).

[10] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

[11] *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *Fay v. Muhlenberg Coll.*, No. 07-4516, 2008 WL 205227, at *2 (E.D. Pa. Jan. 24, 2008).

[12] *Twombly*, 550 U.S. at 555, 564.

[13] *Id.* at 570.

[14] *Id.* at 562 (internal quotation marks and citations omitted).

[15] *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Brown v. Daniels,* 128 F. App'x 910, 913 (3d Cir. 2005) (quoting *Lum v. Bank of Am.,* 361 F.3d 217, 222 n.3 (3d Cir. 2004)).

## III.   DISCUSSION

### A.  Subject Matter Jurisdiction and Mootness[16]

Relying on Federal Rule of Civil Procedure 12(b)(1), Synchrony moves to dismiss Jazz's claim seeking injunctive relief based on mootness grounds, contending that as it has complied with the Court-approved stipulated preliminary injunction, there is no longer any live controversy as to injunctive relief.[17]  Jazz argues that Synchrony has not fully complied with the stipulated preliminary injunction, and that Jazz seeks other relief than that addressed in the stipulated injunction.[18]

Article III of the Constitution limits federal courts' judicial authority to "cases" or "controversies" that are actual and ongoing.[19]  The actual and ongoing matters "must be extant at all stages of [the court's] review, not merely at the time the complaint is filed."[20]  If "an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during the litigation," the action is no longer "live" and is rendered moot.[21]  However, it must be "impossible for a court to grant any effectual relief" for a claim to be moot.[22]  A claim is therefore still considered "live" when a real and substantial controversy

---

[16] When a motion under Rule 12 is based on more than one ground, courts generally consider a Rule 12(b)(1) challenge first because if it dismisses a complaint for lack of subject matter jurisdiction, all other defenses and objections become moot.  *In re Corestates Trust Fee Litig.*, 837 F. Supp. 104, 105 (E.D. Pa. 1993), *aff'd*, 39 F.3d 61 (3d Cir. 1994).

[17] Defs.' Mem. of Law in Supp. of Mot. to Dismiss [Doc. 19] at 4.

[18] Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss [Doc. 21] at 5-6.

[19] *Khodara Envtl., Inc. ex rel. Eagle Envtl., L.P. v. Beckman*, 237 F.3d 186, 192–93 (3d Cir. 2001).

[20] *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 247 (3d Cir. 2013) (quoting *Genesis Healthcare Corp. v. Symczyk*, 133 S.Ct. 1523, 1528 (2013)).

[21] *Id.* (citing *Symczyk*, 133 S.Ct. at 1528); *see also N.J. Tpk. Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 31 (3d Cir. 1985) ("[M]ootness has two aspects: (1) the issues presented are no longer 'live' or (2) the parties lack a cognizable interest in the outcome.")) (citing *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980)).

[22] *Knox v. Serv. Employees*, 567 U.S. 298, 307 (2012) (internal quotation marks omitted) (citations omitted).

exists between parties, however small, which can be resolved by specific relief granted by the court.[23]

Jazz's claim for injunctive relief is not rendered moot since Jazz has not been afforded complete injunctive relief.[24] The preliminary injunction did not require Synchrony to end its relationship with Harmony, and there is still a dispute as to whether Synchrony has fully complied with the Court-approved stipulated preliminary injunction,[25] including assertions that Synchrony failed to produce various confidential documents within the deadline specified in the injunction, and failed to refrain from further disclosing confidential information.[26] In addition, Jazz's request for permanent injunctive relief in its Complaint has not yet been addressed by this Court.[27] Because the Court retains the ability to determine whether further specific injunctive relief is required, Jazz's claim for injunctive relief is "live," and not moot.[28]

### B. Motion to Dismiss for Failure to State a Claim

---

[23] *Old Bridge Owners Coop. Corp. v. Twp. of Old Bridge*, 246 F.3d 310, 314 (3d Cir. 2001) (citation omitted); *see also Chafin v. Chafin*, 568 U.S. 165, 173 (2013) (finding that where a party maintains "a concrete interest, however small, in the outcome of the litigation, the case is not moot"); *Ruocchio v. United Transp. Union, Local 60*, 181 F.3d 376, 383 (3d Cir. 1999) ("[T]he issue is . . . whether the decision of the dispute continues to be justified by sufficient prospect that it will have impact on the parties.") (citation omitted).

[24] *See Salter v. Phila. Hous. Auth.*, No. 99-1681, 1999 WL 997758, at *3 (E.D. Pa. Nov. 3, 1999) ("A plaintiff's claims become moot when, subsequent to the filing of a suit, complete relief is afforded in full satisfaction of plaintiff's claims.") (citations omitted).

[25] Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss [Doc. 21] at 6.

[26] Decl. of Sharon K. Galgliardi [Doc. 21-2]. Synchrony's argument that it returned all confidential information that remained in their possession after they left working with Jazz is only a self-serving denial, insufficient to resolve the issues of fact. *NVR Inc. v. Davern*, No. 15-5059, 2015 WL 9450831, at *3 (D.N.J. Dec. 23, 2015).

[27] Compl. Prayer for Relief.

[28] Jazz's Complaint also seeks various forms of monetary relief in the action, including compensatory and punitive damages, and attorneys' fees and costs. Compl. Prayer for Relief. It is well settled that the mooting of claims for injunctive and declaratory relief does not always moot an entire case where claims for damages remain. *Flagg Brothers v. Brooks*, 436 U.S. 149, 154 n.3 (1978); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 7–9 (1978). The Third Circuit has held that even when injunctive relief may be moot, damages and attorneys' fees claims will typically continue to present a live controversy. *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 218 (3d Cir. 2003); *see also Jersey Cent. Power & Light Co. v. New Jersey*, 772 F.2d 35, 41 (3d Cir. 1985) ("[T]he availability of damages or other monetary relief almost always avoids mootness."). Thus, even if injunctive relief were considered moot in this case, Jazz's other claims are not.

Section 14 of the MSA states: "This Agreement will be governed in accordance with the laws of the State of California, excluding any choice of law rules which may direct the application of the laws of another jurisdiction."[29] As both parties agree that California law applies to the breach of contract claim, and that Pennsylvania law applies to the misappropriation of trade secrets and breach of duty claims, the Court will adhere to this framework in its assessment of these claims for purposes of Synchrony's motion to dismiss.[30]

### 1. Breach of Contract

Synchrony argues that Jazz has not alleged that Synchrony breached any provisions of the MSA.[31] To state a claim for breach of contract under California law, a plaintiff must allege: (1) the existence of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damage to the plaintiff.[32] To determine whether a plaintiff has stated a claim for breach of contract, a court must compare the allegations of the complaint with the terms of the contract.[33]

---

[29] Pl.'s Mem. of Law in Supp. of Mot. for TRO and Prelim. Inj., Decl. of Matthew Wiley, Ex. A [Doc. 5-5].

[30] *See also Am. Hearing Aid Assocs. v. GN ReSound N. Am.*, 309 F. Supp. 2d 694, 704 n.14 (E.D. Pa. 2004) (holding that the choice of law clause referring to "this agreement" limits application of the provision to contract claims, rather than tort claims); *Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc.*, 848 F. Supp. 569, 576 (E.D. Pa. 1994) (holding that a choice of law provision that was limited on its face to "this agreement" should not be applied to tort claims).

[31] Synchrony also argues that it cannot be liable for breaching its contract with Jazz by virtue of its engagement with Harmony, since Synchrony has the statutory right to work for whomever it chooses. Cal. Bus. & Prof. Code § 16600. Synchrony incorrectly broadens the scope of this statute, which is used to invalidate an employment agreement that interferes with an employee's ability to compete with an employer *after* his or her employment ends. California law has expressly noted: "While California law does permit an employee to seek other employment and even to make some 'preparations to compete' before resigning [citation], California law does not authorize an employee to transfer his loyalty to a competitor. During the term of employment, an employer is entitled to its employees' 'undivided loyalty.' [Citation.]" *Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 509 (Cal. Ct. App. 2013) (quoting *Fowler v. Varian Assocs., Inc.*, 196 Cal. App. 3d 34, 41 (Cal. Ct. App. 1987)).

[32] *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (Cal. Ct. App. 2014) (citing *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (Cal Ct. App. 1990)).

[33] *See Waller v. Truck Ins. Exchange, Inc.*, 900 P.2d 619, 627 (Cal. 1995).

Synchrony does not dispute that Jazz has properly alleged the existence of a contract and Jazz's performance.[34] Synchrony instead argues that Jazz has not alleged that Synchrony breached the MSA. However, Jazz has alleged that Synchrony breached requirements that it not use or disclose Jazz's specified confidential information at any time or for any purpose, without Jazz's prior written consent.[35] Moreover, Synchrony also allegedly failed to "promptly" return or "lawfully destroy" all of Jazz's confidential information "upon the earlier of the termination of this [MSA]."[36] Finally, Jazz alleges that Synchrony's decision to simultaneously work for Harmony and Jazz, without segregating its employees on the two accounts, breached the normal practices of the industry in violation of the contractual requirement of due care.[37] Because Jazz has alleged a causal connection between the breach and damages,[38] it has therefore stated a claim for a breach of contract in Count III.[39]

## 2. DTSA and PUTSA

Synchrony also argues that Jazz has failed to state a claim for misappropriation of trade secrets under the DTSA and the PUTSA because the allegations of misappropriation are speculative, vague, and conclusory. According to Synchrony, Jazz's claims solely rest on

---

[34] Jazz has alleged the MSA's existence as a contractual agreement between Jazz and Synchrony in its Complaint, with a term extending until March 1, 2018. Compl. ¶ 19. Jazz also performed according to the terms of the MSA. Compl. ¶ 26. Under California law, both parties must perform according to the terms of a valid agreement. *Palmquist v. Palmquist*, 212 Cal. App. 2d 322 (Cal. Ct. App. 1963).

[35] Compl. ¶¶ 82, 83.

[36] Compl. ¶¶ 50, 84. *See Heinemann v. Computer Assocs. Int'l, Inc.*, 171 F. App'x 704, 708 (9th Cir. 2006) (addressing that under a breach of contract claim, an employee's failure to return all property, despite the requirement to do so under the employment contract, was grounds to support a breach).

[37] *See* Compl. ¶¶ 86, 87 (alleging that Synchrony was required to furnish services to Jazz "with due care in accordance with the standards and practices with [sic] are generally accepted in the industry and exercised by other persons engaged in performing similar services in the local area").

[38] *See* Compl. ¶ 88 ("Synchrony's breach of the 2012 MSA has injured Jazz, has caused financial damages to Jazz, and will continue to injure and cause financial damages to Jazz unless a remedy is provided by this Court.").

[39] *See Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal. App. 2d 506, 511 (Cal. Ct. App. 1967) (holding that a "breach of contract without damage is not actionable" and that "damages are not recoverable which are not causally connected with the breach of a contract") (citations omitted).

Synchrony's awareness of certain trade secrets, which only demonstrate a *potential* for

Synchrony to unlawfully use or disclose such trade secrets in the future.

The Complaint alleges that Synchrony had access to confidential marketing materials,

non-public drug sales data and data regarding physician-prescribing habits, analyses of prescriber

and patient data commissioned by Jazz, marketing research, analyses of its own products

compared to other narcolepsy products, and risk evaluation and mitigation strategy research.[40]

Although the DTSA and the PUTSA use different wording, both statutes define a "trade secret"

as information that: (1) the owner has taken reasonable means to keep secret; (2) derives

independent economic value, actual or potential, from being kept secret; (3) is not readily

ascertainable by proper means; and (4) others who cannot readily access it would obtain

economic value from its disclosure or use.[41]  Jazz's Complaint sufficiently alleges information

qualifying as trade secrets.[42]

However, Jazz has not alleged that the names of employees constitute trade secrets.  Jazz

alleges that the CEO of Synchrony admitted that he disclosed the names of several Jazz

employees in commercial, medical affairs, and regulatory roles so that Harmony could try to hire

---

[40] Compl. ¶ 30.

[41] *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659 (E.D. Pa. 2018) (citing 18 U.S.C. § 1839(5); 12 Pa. Cons. Stat. Ann. § 5302).  A trade secret may consist of "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Kewanee Oil v. Bicron Corp.*, 416 U.S. 470, 474–75 (1974); *see also Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 112 (3d Cir. 2010) ("[T]rade secrets need not be technical in nature to be protected fully by Pennsylvania law.") (internal quotation marks omitted).

[42] Jazz alleges it safeguarded its confidential information from public disclosure.  Compl. ¶¶ 33-34.  The information also has significant economic value within the sleep-related drug products community.  Compl. ¶ 32.  Recreating Jazz's wealth of expertise from a baseline level for a new pharmaceutical company, as Jazz alleges, would take "years and many millions of dollars."  Compl. ¶ 32.  Thus, a pharmaceutical company seeking to develop and market a drug for the treatment of narcolepsy could potentially have a significant advantage, to the detriment of Jazz, by having this confidential information being used and disclosed.

them,[43] but fails to allege that it has taken any reasonable means to keep its employee

information a secret, or that employee identities qualify as trade secrets under either statute.

Thus, only confidential information related to Jazz's products,[44] and not its employees, is at

issue. The Court next considers whether Jazz has pleaded misappropriation of trade secrets.

Under the DTSA and the PUTSA, "misappropriation" of trade secrets includes the

"acquisition of a trade secret of another by a person who knows or has reason to know that the

trade secret was acquired by improper[45] means" or the "disclosure or use of a trade secret of

another without express or implied consent."[46] The DTSA and the PUTSA permit a court to

enjoin permanently either (1) actual or (2) threatened misappropriation of trade secrets.[47]

Jazz has sufficiently pleaded that Synchrony actually misappropriated its trade secrets. In

its Complaint, Jazz states that upon information and belief, Synchrony obtained Harmony's

business by "using, touting, and sharing with Harmony [Jazz's] years of knowledge of marking

strategies and tactics for Jazz's sleep medicine franchise—specialized knowledge that is

proprietary to Jazz and that was developed at Jazz's sole expense over the course of many

years."[48] Jazz alleges that Synchrony was aware that Jazz's trade secrets were not to be used or

disclosed to others, that it did not obtain Jazz's consent to use the specified trade secrets except

---

[43] Compl. ¶¶ 44, 52. Jazz now argues that this information was "confidential and sensitive." Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss [Doc. 21] at 9.

[44] Compl. ¶ 30.

[45] Under the DTSA, the term "improper" includes: "(A) [] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

[46] *PDC Machines Inc. v. Nel Hydrogen A/S*, No. 17-5399, 2018 WL 3008531, at *2 (E.D. Pa. June 15, 2018) (citing 18 U.S.C. § 1839(5); 12 Pa. Cons. Stat. Ann. § 5302); *see also FedEx Ground Package Sys., Inc. v. Applications Int'l Corp.*, No. 03-1512, 2008 WL 4279751, at *11 (W.D. Pa. Sept. 12, 2008) ("[T]he tort of misappropriation of trade secrets is based on a violation of a non-contractual duty to retain confidences, which is imposed as a matter of social policy rather than by mutual consensus.").

[47] 18 U.S.C. § 1836(b)(3)(A); 12 Pa. Cons. Stat. Ann. § 5503(a); *see also Bimbo Bakeries*, 613 F.3d at 110.

[48] Compl. ¶¶ 57, 73.

on Jazz's behalf, and identifies Synchrony's instances of deliberate conduct in violation of the

DTSA and the PUTSA.[49]  These allegations move beyond speculation; Jazz has alleged "enough

facts to state a claim to relief" as to actual misappropriation of its trade secrets in Counts I and

II.[50]

Alternatively, Jazz's allegations that Synchrony staffed the Harmony account with

veterans of the Jazz account and refused to ensure it would protect Jazz's trade secrets, state a

claim for threatened misappropriation of trade secrets.[51]  The Third Circuit has held that where

an employee's work for a new employer substantially overlaps with work for a former employer,

based on the same role, industry, and geographic region, a district court may conclude that those

employees would likely use confidential information to the former employer's detriment.[52]  An

employee's additional failure to ensure an employer that it would refrain from using or

---

[49] Compl. ¶¶ 60, 71, 72, 73; *cf. Bioquell, Inc. v. Feinstein*, No. 10-2205, 2010 WL 4751709, at *6 (E.D. Pa. Nov. 23, 2010) (holding that the plaintiff failed to meet the federal pleading requirements because it "ma[de] no effort to identify what conduct [new employer] and [former employee] engaged in which leads it to this conclusion that [plaintiff]'s proprietary information has been and will continue to be used for [new employer]'s benefit").

[50] *Twombly*, 550 U.S. at 570.  The Third Circuit has also long established that well-pleaded allegations that survive a Rule 12(b)(6) motion also include "facts alleged on *information and belief*." *Melo-Sonics Corp. v. Cropp*, 342 F.2d 856, 859 (3d Cir. 1965) (emphasis added); *see also McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267–68 (3d Cir. 2016) ("[P]leading upon information and belief is permissible '[w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control' . . . .") (citations omitted).

Jazz also attempts to offer allegations of actual misappropriation by noting that the CEO of Synchrony admitted to his disclosure of information about Jazz employees to Harmony to help Harmony build its narcolepsy business. Compl. ¶ 44.  Since this employee information does not constitute a trade secret, as previously mentioned, this allegation therefore does not support any actual misappropriation by Synchrony.

[51] *See Fres-co Sys. USA, Inc. v. Hawkins*, 690 F. App'x 72, 76 (3d Cir. 2017) ("Under the [DTSA and PUTSA] giving rise to [plaintiff]'s causes of action, misappropriation of trade secrets need not have already occurred to warrant injunctive relief; threatened misappropriation is sufficient.") (citing 18 U.S.C. § 1836(b)(3)(A)(i); 12 Pa. Cons. Stat. Ann. § 5503(a)).

[52] *See id.* (noting that this applies in the context of both the DTSA and the PUTSA).  Pennsylvania courts have coined this issue as the "inevitable disclosure" doctrine, which provides that an injunction may issue so long as "defendant's new employment 'is likely to result in the disclosure' of a former employer's trade secrets." *Bimbo Bakeries*, 613 F.3d at 111–12 (citation omitted).  District courts have also found that where a plaintiff alleges the defendant has taken a job with "identical and/or nearly identical job responsibilities" with a direct competitor in substantially the same profession, and that defendant has used the plaintiff's trade secrets in the performance of his or her duties, a plaintiff has stated a claim for misappropriation of trade secrets. *Certainteed Ceilings Corp. v. Aiken*, No. 14-3295, 2015 WL 410029, at *5 (E.D. Pa. Jan. 29, 2015).

disclosing the employer's trade secrets, despite their written agreement, may also constitute threatened misappropriation.[53]

Although Synchrony's personnel were not direct employees of Jazz, as they were employed by Harmony to work with Jazz via contractual agreement, Synchrony's alleged access to Jazz's confidential information and their transfer to the account with Jazz's direct competitor, Harmony, without any assurance that trade secrets would be protected,[54] plausibly suggests the threatened misappropriation of Jazz's trade secrets.[55] Jazz has therefore alleged "enough facts to state a claim to relief"[56] as to threatened misappropriation in Counts I and II.

### 3. Breaches of Duty of Loyalty and of Fiduciary Duty

Synchrony next argues that it owed no extra-contractual duty to Jazz, as there was no "special relationship" imposing a fiduciary duty upon Synchrony.[57] Jazz argues that the MSA reposed high levels of trust in Synchrony, sufficient to create a fiduciary relationship. Even if there could be such a relationship here, it is barred by the gist of the action doctrine, as the claims solely arise from the parties' contractual relationship.

The gist of the action doctrine generally bars tort claims that arise exclusively from a contract between the parties, where the duties allegedly breached were grounded in the contract itself, where the liability stems from a contract, or where the tort claim acts as a duplicate of a

---

[53] *See id.* at 75–76 (holding that where an employee, subject to a non-compete agreement, refused to confirm that he would not solicit the employer's customers and would not commit to honoring terms of his agreement, those circumstances could constitute "threatened misappropriation").

[54] Compl. ¶¶ 40, 50.

[55] Synchrony's argument that it returned all confidential information that remained in its possession after it ended the MSA is an issue of fact that cannot be resolved in the context of a motion to dismiss. *NVR Inc.*, 2015 WL 9450831 at *3.

[56] *Twombly*, 550 U.S. at 570.

[57] Defs.' Mem. of Law in Supp. of Mot. to Dismiss [Doc. 19] at 14 (citing *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 22–23 (Pa. Super. Ct. 2002)).

13

breach of contract claim.[58]  To evaluate whether the gist of the action doctrine applies, a court

must identify the duty breached by examining the substance of the allegations comprising a

claim, and determining whether the duty stems from tort law or contract law.[59]  Fiduciary duties

and duties of loyalty will not be barred when they extend "beyond the particular obligations

contained in the [contract] itself," and they arise as a "matter of social policy."[60]

Here, Jazz has failed to allege any duties that exist outside of the parties' contractual

obligations under the MSA.[61]  Jazz's only arguments are its attempts to categorize Synchrony's

engagement in a business relationship with both Harmony and Jazz as existing outside of the

MSA.[62]  Jazz alleges, however, that Synchrony's decision to work for Harmony at the same

time, and without segregating its employees on the two accounts, was a "*breach of, at least, ¶ 7

of the 2012 MSA*."[63]  Jazz does not identify any other obligation on the part of Synchrony outside

of the contemplated MSA,[64] and therefore the gist of the action doctrine bars the breaches of

fiduciary duty and duty of loyalty.  Counts IV and V will therefore be dismissed.

---

[58] *Certainteed Ceilings Corp.*, 2015 WL 410029 at *7 (citing *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 619–20 (E.D. Pa. 2010)).

[59] *DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp. 3d 225, 234 (E.D. Pa. 2017) (citing *Downs v. Andrews*, 639 F. App'x 816, 819 (3d Cir. 2016)); *see also Brown & Brown, Inc.*, 745 F. Supp. 2d at 620 ("Whether the gist of the action doctrine applies in any particular setting is a question of law.").

[60] *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 105 (3d Cir. 2001) ("[T]he larger social policies embodied in the law of torts rather than the terms of the contract, are what underlie [plaintiff]'s breach of fiduciary duty claim.") (internal quotation marks omitted) (citations omitted).

[61] *See also DePuy Synthes Sales, Inc.*, 259 F. Supp. 3d at 236 ("[T]he acts that form the basis for the breach of fiduciary duty/breach of loyalty claim are the identical acts underlying the breach of contract action. . . . These alleged violations mirror, in almost identical fashion, the obligations of the employment agreements which form the basis of the breach of contract claim.").

[62] Pl.'s Mem. of Law in Opp'n of Defs.' Mot. to Dismiss [Doc. 21] at 15.

[63] Compl. ¶¶ 86, 87.

[64] Jazz alleges that Synchrony owed a duty of loyalty to Jazz in "the performance of its duties under the 2012 MSA." Compl. ¶ 91.  Additionally, a "critical component of Synchrony's duty of loyalty to Jazz included the obligation . . . as outlined in the 2012 MSA, and not in furtherance of Synchrony's own interests or the interest of any business competitor of Jazz or other entity." Compl. ¶ 92. Jazz also alleges that as a trusted business partner, "Synchrony owed fiduciary duties to Jazz, which encompass the duty of care as well as the duty of loyalty to Jazz in carrying out

## IV. CONCLUSION

For the foregoing reasons, Synchrony's motion to dismiss for lack of jurisdiction is denied. Synchrony's motion to dismiss Jazz's Complaint is granted as to Counts IV and V, and denied as to Counts I, II, and III.

An order follows.

---

its obligations under the 2012 MSA." Compl. ¶ 98. Jazz specified that this duty of care was outlined in paragraph 7 of the MSA. Compl. ¶ 98.